IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**



VIR2US, INC.,

        **Plaintiff,**

v.                                             Civil Action No. 2:19cv18

SOPHOS INC., et al.,

        **Defendants.**

### <u>OPINION & ORDER</u>

These matters are before the Court on Vir2us's ("Plaintiff" or "Vir2us") Motion for Summary Judgment, Doc. 172, and Sophos and Invincea's (collectively," Defendants") Motion for Summary Judgment, Doc. 175. For the following reasons stated herein, Plaintiff's Motion for Summary Judgment is **GRANTED**. Accordingly, Defendants' Motion for Summary Judgment is **DENIED**.

### I. PROCEDURAL HISTORY

Plaintiff filed its Complaint on January 9, 2019. Doc. 1. Defendants filed a Motion to Dismiss on March 15, 2019. Defendants filed an Answer on August 13, 2019. Doc. 78. With the Answer, Invincea asserted a Counterclaim against Plaintiff. <u>Id.</u> On August 24, 2019, the Court granted the Defendants' Motion to Dismiss, in part with leave to amend, dismissing the parties Sophos Limited and Sophos Group PLC. Doc. 84. On September 3, 2019, Plaintiff filed a Motion to Dismiss Invincea's counterclaim. Doc. 90. The Court denied the Plaintiff's Motion. Doc. 140, 164. Since then, Plaintiff and Defendants filed Motions for Summary Judgment on November 6, 2019. Doc. 172, 175.

## II. BACKGROUND OF THE CASE

This is an action brought by Plaintiff Vir2us to enforce the terms of a settlement agreement.

### A. Parties

Vir2us is a California corporation that designs, markets, and sells computer security software and services. Compl. ¶ 17. It owns several patents that it has licensed to Defendants. Id. ¶ 8. Defendant Invincea Inc. ("Invincea") is a Delaware corporation that entered into a settlement agreement with Vir2us ("Patent License Agreement" or "Agreement") in 2016. Id. ¶¶ 1, 12.

Defendant Sophos Inc. ("Sophos") is a Massachusetts corporation that owns one hundred percent (100%) of the shares of Defendant Invincea. Id. ¶¶ 9, 14.

### B. Patent License Agreement

Vir2us filed a complaint for patent infringement against Invincea Inc. and Invincea Labs, LLC on April 15, 2015. Compl. ¶ 19. Vir2us alleged that Invincea infringed certain claims of U.S. Patent Nos. 7,392,541 and 7,536,598 ("asserted patents") "by making, using, selling and offering to sell certain Invincea products, including Invincea FreeSpace which Invincea later sold as Invincea X Endpoint – Spearphish Protection[1]." Id. These products and asserted patents deal with computer containerization. Doc. 185 at 11. The asserted patents employ containerization to isolate virus and other malware from infecting other applications operating on the computer. Id.[2] On July 15, 2016, Vir2us and Invincea settled the matter before this Court. Id. ¶ 20.

As part of the settlement, Vir2us and Invincea entered into the Patent License Agreement.

---

[1] When it was developed in May of 2016. Doc. 185 at 12.
[2] The '541 patent "operates to containerize any potentially harmful code within a controlled environment to limit the potential damage that a running malicious code can cause." The '598 patent uses "containerization to provide protection against known viruses." Doc. 185 at 11.

2

Doc. 1 at Ex. A (hereinafter, "Agreement").[3] Pursuant to the Agreement, this District is "[t]he exclusive venue for disputes arising out of" the Agreement. Id. ¶ 1; Agreement § 8.5. The Patent License Agreement grants "Invincea and its Affiliates a fully paid, non-exclusive, assignable (only as permitted in [the] license agreement), worldwide license under the Licensed Patents[4] for the life of the Licensed Patents . . . ." Agreement §2.1. The Agreement defines the term "Affiliate". Agreement § 1.[5]

In exchange for use of the Licensed Patents, the Patent License Agreement imposes royalty and reporting obligations on Invincea. It provides: "Invincea shall pay to Vir2us a royalty of one dollar ($1.00) for each Container Products and Services[6] Sold in the United States of America during the Term of this Agreement." Agreement § 3.1. Invincea is responsible for the payment of "all Royalties due [under the Patent License Agreement] for each of Invincea and each Invincea Affiliate." Agreement § 4.2 (hereinafter, "royalty obligations"). Invincea, "on behalf of itself and all Affiliates," must also deliver to Vir2us, within forty-five (45) days following the end of each calendar quarter during the License Term, "a written report of the previous quarter's transactions by Invincea and any Invincea Affiliate regarding all Licensed Products and Services" (hereinafter,

---

[3] The Agreement is filed under seal and is located at Doc. 6, Ex. 1.
[4] The Agreement defines "Licensed Patents" as all patents and patent applications owned by Vir2us, including the asserted patents, "any divisions, continuations, continuations-in-part, reissues, re-examinations, and foreign counterparts of any of the foregoing and all related patents." Agreement § 1.
[5] The Agreement defines Affiliate as follows
> [I]n relation to a Party [i.e. Vir2us or Invincea], another legal entity that, directly or indirectly, owns or controls, or is owned or controlled by, or is under common control with, such Party during the Term of this License Agreement. For the purposes of this definition a first legal entity shall be deemed to own or control a second legal entity if (i) the first legal entity holds, directly or indirectly, more than fifty per cent [sic] (50%) of the voting stock of the second legal entity, ordinarily entitled to vote in the meetings of shareholders of that entity, or (ii) if there is no such stock, the first legal entity holds, directly or indirectly, more than fifty per cent (50%) of the ownership or control in the second legal entity, or (iii) the first legal entity has the power, directly or indirectly, to control the decision of the second legal entity.

Agreement § 1.
[6] The Agreement defines "Container Products and Services" as "the accused container products currently called Invincea X Endpoint – Spearphish Protection and formerly known as Invincea FreeSpace, Invincea Enterprise, and Invincea Advanced Endpoint Protection, as well as natural evolutions and derivations of these products . . . ." Agreement § 1.

"reporting obligations"). Agreement § 4.1. The Patent License Agreement additionally provides a record-keeping requirement: "[e]ach of Invincea and each Invincea Affiliate separately shall keep accurate and complete records and accounts pertaining to the identity and quantity of all Licensed Products and Services Sold." Agreement § 4.4.

### C.     Post-Agreement Compliance and Acquisition

Through Q1 2017, Invincea fulfilled the royalty and reporting obligations. Compl. ¶ 32. On approximately February 8, 2017, Sophos[7] announced via press release that it had entered into an agreement to acquire Invincea from its current shareholders "for a cash consideration of $100 million with a $20 million earn-out." Id. ¶ 25. Sophos completed its acquisition on or around March 22, 2017, with Sophos acquiring one hundred percent (100%) of the shares of Invincea. Id. ¶ 28. Beginning in Q2 2017, Sophos began delivering Quarterly Reports to Vir2us "on behalf of Invincea, which Sophos stated was 'now a Sophos company.'" Id. ¶ 33. Sophos also made the royalty payments for the reported sales of the Licensed Products and Services after its acquisition of Invincea. Id.

Through the acquisition of Invincea, Sophos integrated Invincea's deep-learning, machine learning technology obtained from Invincea into Sophos Intercept X, Sophos Intercept X for Server, and Sophos Sandstorm (collectively, "Sophos Products").[8] Doc. 185 at 13. This deep learning serves to predetermine if an executable file is potentially bad software or malicious in anyway. Id. Sophos Products such as Intercept X are highly complex products that contain "a lot

---

[7] The Complaint generically refers to all Sophos entities named in the Complaint as "Sophos."
[8] Plaintiff explains this fact is essential to their breach of contract case. Both parties agree that Sophos integrated some sort of element of technology from Invincea's products into Sophos's X line. But there is a dispute to what was included. Plaintiff avers certain source code files from Invincea X Endpoint – Spearphish Protection, such as the Cynomix.ccp source code file was found in Spearphish and is now found in Sophos's Products. Defendants note that they integrated technology, but it was only the deep-learning, machine learning technology that is not covered by the Agreement because it is not a product that enables containerization technology.

of files and a lot of lines [of source code]." Doc. 255 at 7. For example, Sophos Intercept X "contained over 20,000 files spread across several hundred, if not thousands, of folders." Id.

**D.    Plaintiff's Breach of Contract Claim**

Vir2us alleges that, "[o]n information and belief Sophos integrated technology from the Invincea products covered by the Patent License Agreement into the Sophos Intercept X products, including technology from the X by Invincea, Invincea X Endpoint – Spearphish Protection, Invincea FreeSpace, Invincea Enterprise, and Invincea Advanced Endpoint Protection line of products." Compl. ¶ 29. It further claims that "Sophos has advertised and represented to the public that it has, in fact, integrated technology from the Invincea products covered by the Patent License Agreement into Sophos's Intercept X product." Id. ¶ 30. However, on April 16, 2018, Sophos announced "the immediate end of sale for all Invincea-related products and support." Id. ¶ 31.

Since then, Sophos has continued to deliver Quarterly Reports and make royalty payments for the sales of the Licensed Products and Services. Id. ¶ 34. However, "[n]oticeably absent from the Quarterly Reports . . . were any Sophos products, including Sophos's Intercept X product, which, on information and belief, contains technology from Invincea's products covered by the Patent License Agreement." Id. ¶ 35. Likewise, Vir2us alleges that "Sophos has failed to make any Royalty payment for any Sophos product, including Sophos's Intercept X product, containing technology from the Invincea products covered by the Patent License Agreement." Id.

Because of Defendants' alleged failure to fully satisfy the terms of the Patent License Agreement, Vir2us brings two (2) counts for Breach of Contract. Count I alleges that Defendants have breached their obligation to deliver, from Q1 2017 onward, Quarterly Reports that include the "quantity and description of all products sold and/or services offered by Invincea and/or its Affiliates." Id. ¶ 42. Count II alleges that Sophos sold products including "at least, Sophos's

Intercept X product," that integrated "Invincea technology from the listed Invincea products specified in the Patent License Agreement." Id. ¶ 48. Therefore, Defendants allegedly breached the Patent License Agreement by failing to pay royalties for these products. Id. ¶¶ 50-51.

E.   **Invincea's Counterclaim for Breach of Contract**

On August 13, 2019, Invincea filed a Counterclaim with the Defendants' Answer alleging that Vir2us breached the Patent License Agreement by "deliberately derail[ing] Sophos's and Invincea's opportunity to divest Invincea's licensed 'container' network security products to a third party, Netainer LLC ("Netainer")." Defs. Countercl. ¶ 1, Doc. 75. The Patent License Agreement specifically outlines the process by which Invincea's subsidiaries could retain their license rights after being divested to a third party. Id. at ¶ 44. Netainer was prepared to offer $6 million for the divestment of Sandboxie Holdings LLC ("Sandboxie") from Invincea but required assurance that the technology would remain licensed under the Patent License Agreement. Id. at ¶ 1. Invincea avers that Vir2us failed to provide confirmation that it would execute a new license agreement with Netainer following the acquisition. Id. Invincea claims under Sections 2.1.2 and 2.1.2.2 of the Patent License Agreement, Vir2us "must execute a new license agreement in the form of the [Patent License Agreement], if Invincea divested Sandboxie to a third party." Id. ¶ 28.

Moreover, Invincea alleges that Vir2us responded to series of communications with unsubstantiated objections and indications that it would not comply to execute a new license agreement with Netainer. Id. ¶¶ 29-36. Sophos and Invincea outline that Vir2us communicated that it is "under no obligation to confirm or enter into any discussions with Sophos' about the transaction." Id. ¶ 37. Sophos and Invincea indicate that Vir2us took the position that it would only: (1) directly negotiate with Netainer and/or (2) deal directly with Sandboxie once it loses its status as an Invincea Affiliate and negotiate a new agreement at that time. Id. ¶¶ 33, 36. As a result

of these allegations, Invincea alleges one count of breach of contract that Vir2us breached their duty under Sections 2.1.2 and 2.1.2.2 of the Patent License Agreement to accept and enter into a 'new license agreement' prior to divestiture" of Sandboxie. Id. ¶ 44.

### III. PLAINTIFF'S AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

#### A. Legal Standard

Summary judgment under Rule 56 is appropriate only when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322–24 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–50 (1986); Groves v. Comm'n Workers of Am., 815 F.3d 177, 180 (4th Cir. 2016). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings but must instead set forth specific facts illustrating genuine issues for trial. Celotex, 477 U.S. at 322–24. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

A mere scintilla of evidence is insufficient to withstand a motion for summary judgment. Rather, the evidence must be such that the factfinder reasonably could find for the nonmoving party. See Anderson, 477 U.S. at 252. Although the court must draw all justifiable inferences in favor of the nonmoving party, in order to successfully defeat a motion for summary judgment, a nonmoving party cannot rely on "mere belief or conjecture, or the allegations and denials contained in his pleadings." Doyle v. Sentry Ins., 877 F. Supp. 1002, 1005 (E.D. Va. 1995) (citing Celotex, 477 U.S. at 324).

To succeed on a breach of contract claim, the Plaintiff must prove that there is "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Filak v. George, 594 S.E.2d 610, 614 (Va. 2004). The obligations and duties of the contract must be interpreted to analyze whether the defendant is in breach. Therefore, in a matter of contractual interpretation, "[t]he first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face. World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 245 (4th Cir. 1992). "If the terms of the contract are clear and unambiguous, then we [the Court] must afford those terms their plain and ordinary meaning; however, if the terms are vague or ambiguous, then we [the Court] may consider extrinsic evidence to interpret those provisions." Providence Square Assocs., L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir. 2000) (citing Shoup v. Shoup, 525 S.E.2d 61, 63-64 (Va. Ct. App. 2000) (applying Virginia principles of contract interpretation)). If the Court finds that the provisions are ambiguous, then the Court "may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if that evidence is, as a matter of law, dispositive of the interpretive issue, grant summary judgment on that basis." World-Wide Rights Ltd. P'ship, 955 F.2d at 245. Moreover, summary judgment is inappropriate if the extrinsic evidence leaves genuine issues of fact regarding an ambiguous contract's proper interpretation. Id.

However, in the case of unambiguous language, the Court will construe the plain and ordinary meaning of the terms and "properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue." Id. Thus, "a court may not, where the contractual language is clear, invite or accept the submission of extrinsic evidence, 'find'

ambiguity in the contractual text based upon that evidence, and resolve the found ambiguity by resort to that extrinsic evidence." Schneider v. Continental Casualty Co., 989 F.2d 728, 731 (4th Cir. 1993). If an ambiguity is to be found it must be apparent from the "face of the contract." Id.

**B. Analysis**

Plaintiff contends it is entitled to summary judgment for three reasons: (1) Defendants breached Section 4.1 of the Agreement by failing to deliver quarterly reports to Plaintiff that contain the complete sales data for all products covered by the Agreement; (2) Defendants violated Section 3.1 of the Agreement by failing to pay the royalties owned by the Agreement on each sale by Defendants' of products defined as "Container Products and Services"; and (3) Plaintiff is not liable on Invincea's Counterclaim because it did not breach sections 2.1.2 and 2.1.2.2 of the Agreement.

In contrast, Defendants counter that summary judgment is appropriate in their favor because the accused Invincea and Sophos's products are not "Container Products and Services" and, therefore, fall outside of the royalty and reporting obligations of the agreement. They aver that only Invincea X Endpoint – Spearphish Protection incorporated "Vir2us royalty-bearing container technology" and as such Defendants do not have any obligations regarding Invincea or Sophos's non-container products that utilize only Invincea's machine learning technology.[9] The Defendants' aver that the definition of "Container Products" means only products that employ containerization. Accordingly, they contend they did not breach the agreement because their products do not incorporate any containerization technology. In the alternative, Defendants

---

[9] Defendants state that Plaintiff's entire case requires the Court to ignore these meaningful differences among Invincea's products and group them all together as the same product. They argue that the analysis turns on source code—invisible to the Invincea customer—that may be "included" in the software but not enabled. See Doc. 178 at 5 (arguing that all "'X by Invincea' products" "consist[] of the same source code").

9

contend that Sophos's Products are excluded from the royalty and reporting requirements by operation of Section 5.3.1 of the Agreement.

*i. Plaintiff's Claim for Breach of Contract*

**a. Section 4.1 & Section 3.1 of the Agreement**

Here, the Court agrees with the parties and finds that the Agreement's provision in question is clear and unambiguous. Accordingly, the law dictates that "the contract is construed according to its plain meaning." RECP IV WG Land Inv'rs LLC v. Capital One Bank, N.A., 811 S.E.2d 817, 825 (Va. 2018) ("Words that the parties used are normally given their usual, ordinary, and popular meaning."). The Agreement defines "Container Products and Services" as "accused container products currently called Invincea X Endpoint – Spearphish Protection and formerly known as Invincea FreeSpace, Invincea Enterprise, and Invincea Advanced Endpoint Protection . . . ." Agreement § 1 (emphasis added).[10] Therefore, the Agreement requires Invincea to pay Vir2us royalties for "each Container Products and Services Sold in the United States of America during the Term of this Agreement." Agreement § 3.1. With respect to the Agreement's reporting obligation, this duty requires Invincea to periodically "deliver to Vir2us a written report of the previous quarter's transactions by Invincea and any Invincea Affiliate regarding all Licensed Products and Services." Agreement § 4.1.[11] Reading these provisions in tandem, the reports required by Section 4.1 cover only those "Sold" products meaning sales of only those products defined as Container Products and Services. Accordingly, the Section 4.1 and 3.1 obligations carry a duty to report sales of "Container Products and Services" and pay a royalty on the sales of those

---

[10] The language of the Agreement also requires Defendants to report and pay a royalty on "natural evolutions and derivations" of the listed products. Since the Court has determined that the Defendants' products are classified as one of the named "Container Products", the Court need not interpret the definition of this term in the Agreement.

[11] "Licensed Products and Services" are defined as "products Sold and/or services offered by Invincea or any of its Affiliates, with or without charge, during the Term of the License Agreement." Agreement § 1.

10

products. Thus, the clear language of the Agreement lends to an unambiguous interpretation that the reporting and royalty obligations are directly tied to any products defined by the Agreement as "Container Products and Services." Defendants' argue that their products fall outside of the definition of "Container Products and Services" because their products do not utilize any of the accused containerization technology and/or source code that was the subject of the original patent litigation.

To determine if the Defendants' argument has merit, it is helpful to understand the nature of the products at issue in this case. In May of 2016, Invincea developed the X by Invincea product line.[12] Doc. 185 at 12. Different versions were licensed to customers by Invincea including "X by Invincea – Spearphish Protection, X by Invincea – Detect, X by Invincea – Prevent, X by Invincea – Isolate, and X – by Invincea – Complete [(collectively, "Invincea Products")]." Id. The Spearphish Protection product used containerization and isolation technology to protect against "spear phishing attacks by opening links and attachment[s] sent via email." Id. at 13. In contrast, Invincea's Prevent product line utilized machine learning technology. See Id. Invincea also sold a complete version of all its technologies in the X - Complete product. This product included "(i) container technology, (ii) deep-learning, machine learning technology, and (iii) behavioral detection technology." Id. Invincea paid royalties under the Agreement on the products that employed the container technology, X by Invincea – Spearphish Protection, X by Invincea – Isolate and X by Invincea Complete. Id. Despite their different functionality, all of these versions of the X by Invincea product are comprised of the same source code. Doc. 248 at 7. Therefore, regardless of what a customer bought from Invincea, "the customer received the code for everything." Id.

---

[12] The Defendants in their motion lay out specific facts that help illustrate the products in question in this case. See Doc. 185 at 12.

Invincea uses a "license file to distinguish between different versions of X by Invincea products." Id. The license file "specif[ies] that a user does not have access to certain features for the X by Invincea product even though the code to implement that feature is included on the user's computer." Doc. 186-2 at 21.[13] Accordingly, the source code for Invincea Spearphish Protection may be included in all products but was not "accessible by Invincea's customers" unless the customer paid for that feature and the license file enabled its use. Doc. 255 at 6. For example, Invincea X Endpoint – Spearphish Protection contains all the source code that is present in X – by Invincea – Complete but Invincea X Endpoint – Spearphish Protection's license file has enabled containerization functionality and disabled the other features such as machine learning. Here, Sophos has taken the "machine learning technology" from the X line of products and incorporated the source code into its own products such as Intercept X and Sandstorm. Doc. 178 at 5. Specifically, Plaintiff cites to one source code file, cynomix.cpp, that was taken from Invincea's Spearphish Protection product and placed into the Sophos Products. Id. This source code incorporated into the accused Invincea and Sophos Products does not provide containerization functionality but is related to Invincea's machine learning products. Therefore, Defendants contend that it is enablement or lack of enablement of the source code that makes each Invincea X product distinctly different from each other. Defendants' aver their products fall outside the scope of the Agreement because their products cannot be classified as X by Invincea – Spearphish Protection because the products do not have enabled containerization technology.

However, despite Defendants' attempted differentiation, this Court "has neither the duty

---

[13] To turn on the features, the X by Invincea products contained a feature flag capability. Feature flags operate like a light switch turning on or turning off certain features of the code that is imbedded in the product.[13] So even though all X by Invincea products have the same source code – certain features are disabled or enabled by using the license file and feature flags to determine what features of the code (i.e., machine learning or container technology) are enabled. Id. at 21.

nor the inclination to creatively construe an unambiguous contractual phrase 'so as to conform it to the court's notion of the contract [the parties] should have made' under the circumstances.'" Babcock & Wilcox Co. v. Areva NP, Inc, 788 S.E.2d 237, 249 (Va. 2016) (quoting Ames v. American Nat'l Bank, 176 S.E. 204, 216 (Va. 1934)). The Court's duty in interpreting the Agreement is "to declare what the instrument itself says it says" unaltered by what it should or might have said in alternative circumstances. Id. (citing Wilson v. Holyfield, 313 S.E.2d 396, 398 (Va. 1984)). Here, the Agreement's unambiguous definition of "Container Products" does not make any distinction or classification by containerization technology or containerization enablement. The definition of "Container Products" is a product-based list. The Agreement, unambiguously, carries with it reporting and royalty obligation on the sale of any of the products within the list regardless of what technology is enabled or disabled within it. Accordingly, the Court must simply determine whether the source code from Invincea X Endpoint, which is incorporated into Invincea and Sophos Products, causes those products to be defined as "Container Products or Services" as outlined by the Agreement. On that question, the Court agrees with the Plaintiff.

The evidence indicates and Defendants admit that source code from one of the named products, Invincea Endpoint – Spearphish Protection, has been incorporated into both the Sophos Products and the other Invincea Products. See Doc. 186-3 at 6 (Report of Defendants' Expert David Martens). The law requires the Court to construe the Agreement as it is written. Therefore, for purpose of the Agreement, Defendants' products are properly classified as a Container Product because they utilize source code from one of the listed products, particularly, Invincea X Endpoint – Spearphish Protection. Because the Agreement makes no differentiation based on type of technology or enablement of that technology, the Court finds the Defendants' reading of

"Container Products and Services" unpersuasive. Therefore, Plaintiff has proved as a matter of law that Defendants are in breach of contract when they failed to report sales and pay royalties on their products that incorporate source code from Invincea X Endpoint – Spearphish Protection. Considering this finding, summary judgment is appropriate in favor of the Plaintiff.

**b. Section 5.3.1 of the Agreement**

Furthermore, Defendants aver that Sophos's Products are excluded from the Agreement by operation of Section 5.3.1. Doc. 185 at 25. Defendants contend that "Sophos's rights and obligations under the Patent License Agreement are limited to products and services offered by Invincea (or its Affiliates) in existence at the time of Sophos's acquisition of Invincea."[14] Id. Section 5 is entitled "Assignment and Transferability." Agreement § 5. The sections relevant to Defendants' argument are as follows:

> § 5.2. Except as set forth in Section 5.3 below, Invincea may not assign this Agreement or any or all of its rights and obligations under this License Agreement to a third party ("Acquiring Entity") without prior notice to and express written consent of Vir2us.[15]
>
> § 5.3. Notwithstanding Section 5.2, Vir2us' consent shall not be required and Invincea may assign this Agreement to a third party ("Acquiring Entity"), in connection with the assignment by Invincea of <u>all its rights and duties under this License Agreement</u> to an Acquiring Entity in connection with the acquisition by such Acquiring Entity of Invincea, of all, or substantially all of the assets relating to the Container Products and Services, and/or an Affiliate (collectively, "Acquired Entities"), <u>provided such Acquiring Entity expressly agrees in writing prior to such acquisition and assignment to assume and perform all of Invincea's obligations under this Agreement, and to the additional conditions and limitations in Section 5.3.1</u>.
>
> § 5.3.1. The rights acquired by an Acquiring Entity as permitted by this Section shall apply only to Licensed Products and Services and natural evolutions of

---

[14] The two relevant products that Defendants aver fall outside the scope of the Agreement are Sophos Intercept X and Sophos Sandstorm. Doc. 185. at 26.

[15] As previously stated in the Court's Motion to Dismiss Order, under Section 5.2 "Invincea may not assign "any or all" of its rights or duties under the License Agreement to a third-party, "Acquiring Entity" without Vir2us' written consent." Doc. 84 at 16 (citing Agreement § 5.2). There is no allegation in this case that Vir2us gave its written consent.

14

> Licensed Products and Services that were in existence as of the consummation of the acquisition <u>and shall not apply to any other pre-existing or future products or services of the Acquiring Entity or of any subsequent Acquiring Entity</u>.

Agreement § 5.2-5.3.1 (emphasis added). Section 5.3 states that Plaintiff's consent shall not be required if an Acquiring Entity provides express agreement in writing that they would "assume and perform all of Invincea's obligation under this agreement" and be subject to the limitations in Section 5.3.1. Agreement § 5.3. The Court has previously stated that, "Section 5.3 defines an "Acquiring Entity" as a third party to whom Invincea assigns the Patent License Agreement: 1) with express written consent of the Acquiring Entity; and 2) in connection with the assumption of <u>all</u> Invincea's rights and obligations under the Agreement." Doc. 84 at 16 (citing Agreement § 5.3). The Court must afford these specifications meaning. See <u>Condo. Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.</u>, 709 S.E.2d 163, 170 (Va. 2011) ("Contract language will not be treated as meaningless where it can be given a reasonable meaning.") (quotations omitted); <u>Hale v. Hale</u>, 590 S.E.2d 66, 68 (Va. App. 2003) ("Where possible, meaning must be given to every clause [of a contract]."). As the Court previously noted "[t]here is no allegation that Sophos gave written consent to assume the Patent License Agreement, nor does Vir2us allege that the Sophos acquired all of Invincea's obligations under the Agreement." Doc. 84 at 17. Therefore, Section 5.3 is inapplicable because the Defendants have not "offered any evidence that Sophos gave written consent to assume the Patent License Agreement or that Sophos acquired all of Invincea's obligation under the Patent License Agreement." Doc. 248 at 18. Accordingly, the Defendants' argument has no merit because they do not fall within the definition of an "Acquiring Entity." Therefore, on summary judgment, the Court agrees with its previous rationale and finds that the Sophos's Products are not excluded from scope of the royalty and reporting obligations.

### ii. *Defendants' Counterclaim*

Additionally, Plaintiff has averred they are entitled to summary judgment on Invincea's counterclaim. The Court has determined that Defendants' are in breach of the Patent License Agreement. As such, the Court is not required to rule on the merits of Invincea's counterclaim, specifically, whether Plaintiff was in breach of its obligations under Sections 2.1.2 and 2.1.2.2 of the Agreement. It is well established under Virginia common law that "a party who commits the first breach of a contract is not entitled to enforce the contract." Mathews v. PHH Mortg. Corp., 724 S.E.2d 196, 198 (2012). Therefore, "[i]f the initial breach is material, the other party to the contract is excused from performing his contractual obligations." Id. A breach is material when a party fails "to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." Id. Here, the Agreement was entered by the parties to provide a reasonable royalty to Vir2us for the use of its patented technology. As such, a failure to pay royalties on one of the "Container Products or Services" defeats an essential purpose for which the Agreement was entered. Therefore, the Court finds the Defendants are in material breach and cannot maintain an action against Plaintiff on a different provision of the Agreement. Accordingly, Plaintiff is entitled to judgment as a matter of law on Invincea's counterclaim.

### IV. RELIEF GRANTED

For the reasons stated herein, Plaintiff's Motion for Summary Judgment is **GRANTED**, and Defendants' Motion for Summary Judgment is **DENIED**. At the December 17, 2019 Status Conference, the parties furnished stipulations to the Court which laid out the amount of royalties due on products covered by the Agreement. However, these documents, while made available to the court, were not filed as an agreed stipulation. Therefore, if the parties be so advised, they may

file a joint stipulation regarding the reporting requirements and royalty amount due to the Plaintiff within ten (10) days of this Order. The Court will determine the amount of interest based on the judgment rate from the time that the payments were originally due. If no stipulation is filed, the Court **ORDERS** that Defendants' shall file the delinquent quarterly reports consistent with the rulings in this Order within thirty (30) days. Additionally, the Court **ORDERS** that the Defendants pay Plaintiff all royalties due under the Agreement, with interest at the judgment rate from the time payments were originally due, within sixty (60) days of this Order.

The Clerk is **REQUESTED** to electronically deliver a copy of this Opinion & Order to all counsel of record.

It is **SO ORDERED**.

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge

HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

March 31, 2020
Norfolk, Virginia