UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

VIR2US, INC.,

          Plaintiff,

v.                                      ACTION NO. 2:19cv18

SOPHOS INC., et al.,

          Defendants.

## <u>OPINION AND ORDER</u>

This matter is before the Court on plaintiff's, Vir2us, Inc. ("Vir2us"), motion to exclude Invincea, Inc.'s ("Invincea") damages expert, Sara Rinke ("Rinke"), ECF No. 581; defendants', Sophos, Inc. ("Sophos") and Invincea (collectively "defendants"), motion to exclude certain opinions and testimony of Vir2us's expert witnesses, ECF No. 590; and defendants' motion to strike in part the second supplemental expert report of Vir2us's damages expert, Michael J. Dansky ("Dansky"), ECF No. 620.  As the motions are fully briefed and no hearing is necessary, this matter is ripe for review.

For the reasons discussed below, Vir2us's motion to exclude Rinke, ECF No. 581, is **DENIED**; defendants' motion to exclude certain opinions and testimony of Vir2us's expert witnesses, ECF No. 590, is **GRANTED IN PART** and **DENIED IN PART**; and defendants' motion to strike in part Dansky's second supplemental expert report, ECF No. 620, is **GRANTED**.

# I.    BACKGROUND[1]

## A.    Factual Background

On July 15, 2016, Vir2us, Invincea, and their affiliates entered into a Patent License Agreement ("Agreement") as a part of the settlement of a then-ongoing patent infringement lawsuit. ECF No. 597-1. Under the Agreement, Vir2us granted Invincea a license to "all patents and patent applications owned by Vir2us, including the Asserted Patents,[2] any divisions, continuations, continuations-in-part, reissues, re-examinations, and foreign counterparts of any of the foregoing and all related patents[.]" *Id.* at 3–4.[3]   In return for the license, under ¶ 3.1 of the Agreement, Invincea was to "pay to Vir2us a royalty of ▮▮▮▮▮▮▮▮ for each Container Products and Services Sold in the United States . . . during the Term of [the] Agreement[.]" *Id.* at 5. The Agreement defines "Container Products and Services" as:

> the accused container products currently called Invincea X Endpoint – Spearphish Protection and formerly known as Invincea FreeSpace, Invincea Enterprise, and Invincea Advanced Endpoint Protection, as well as natural evolutions and derivations of these products, including the delivery of the foregoing as a subscription service.  For the purposes of royalties (only), the term "Container Products" excludes any stand-alone Sandboxie Product and the 2 Cent Dell Shipment License.

*Id.* at 3. In addition to the royalty payments, ¶ 4.1 of the Agreement requires Invincea to "deliver to Vir2us a written report of the previous quarter's transactions . . . regarding all Licensed Products and Services" within "45 days following the end of each calendar quarter during the License Term." *Id.* at 6.

---

[1] These facts are drawn from the Court's Opinion and Order dated August 16, 2024, ECF No. 574.

[2] The Agreement defined "Asserted Patents" as "U.S. Patent Nos. 7,536,598 and 7,739,541." ECF No. 597-1, at 2.

[3] All pincites are to the ECF page number in the blue header of the respective filing.

Invincea X Endpoint-Spearfish Protection contains the same source code as other "X by Invincea Products" including Prevent, Detect, and Complete. ECF No. 574, at 3. Invincea uses license files, which control the features that users can access, to distinguish between the various X by Invincea products. *Id.* From 2016 through 2017, Invincea delivered the required quarterly reports to Vir2us. *Id.* Invincea paid Vir2us royalties only on the products listed in these quarterly reports. *Id.* at 4. These reports, however, did not include Invincea's sales of Invincea X – Prevent, Invincea X – Detect, Invincea X Management, and Invincea X Management Enterprise. *Id.*

Sophos acquired 100% of Invincea on March 22, 2017, becoming an affiliate of Invincea. *Id.* After the acquisition, Sophos delivered quarterly reports to Vir2us on behalf of Invincea, and only paid royalties on products contained in these reports. *Id.* These reports did not include any Sophos products. *Id.* Although Sophos integrated Invincea's machine learning source code into Intercept X and Sandstorm—two of its products—Invincea's container technology is not integrated into any Sophos product. *Id.*

Paragraph 2.1.2 of the Agreement—titled "Rights of Affiliates after Divestiture"—provides that Invincea Labs, LLC ("Invincea Labs"), and Sandboxie Holdings, LLC ("Sandboxie"), "may retain their license rights to the Licensed Patents after they lose their status as an Invincea Affiliate[,]" if certain conditions are satisfied. ECF No. 597-1, at 3. Paragraph 2.1.2.2 provides that Invincea Labs and Sandboxie "must execute a new License Agreement in the form of this Agreement . . . directly with Vir2us which Vir2us must execute." *Id.*

In April 2019, Sophos informed Vir2us that it was exploring the possibility of spinning off Sandboxie to Netainer LLC ("Netainer") and provided to Vir2us a new draft patent license agreement. ECF No. 499-8; ECF No. 499-9, at 4. In response, Vir2us stated that Sophos misunderstood the Agreement and that it was "under no obligation to confirm or enter into any

discussions with Sophos." ECF No. 499-9, at 2. Further, Vir2us stated that if Sandboxie lost its status as an Invincea Affiliate, it "should contact Vir2us directly" if it wished "to discuss a new license agreement with Vir2us." *Id.* The deal between Sophos and Netainer ("Netainer Deal") did not close. ECF No. 574, at 5.

## B.    Procedural History

In early 2019, Vir2us sued defendants for breach of contract. ECF No. 6. The complaint alleges that defendants breached the Agreement by: (a) failing to pay Vir2us the ▮▮▮ royalty for each Container Products and Service sold in the United States during the term of the Agreement, as required by ¶ 3.1; and (b) failing to comply with the reporting requirements set forth in ¶ 4.1. ECF No. 6 ¶ 6. Along with its answer to the complaint, Invincea asserted a counterclaim against Vir2us, alleging that it breached the Agreement when it refused to execute a new license agreement as part of the Netainer Deal. ECF No. 78, at 17.

After the Court granted summary judgment to Vir2us, defendants appealed to the United States Court of Appeals for the Fourth Circuit, which vacated the judgment. *Vir2us, Inc. v. Sophos Inc.*, No. 21-1402, 2023 WL 2136379, at *4 (4th Cir. Feb. 21, 2023). The court reasoned that the Agreement "unambiguously . . . provides an exhaustive list of the 'accused container products'" and that "[t]he disputed Invincea and Sophos products are not included in that list and thus cannot be classified as such." *Id.* at *3 (citation omitted). In any event, the court remanded the case to determine "in the first instance" whether the Sophos products or Invincea products are "natural evolutions and derivations" of the products listed in the Agreement. *Id.* at *4.

On remand, the parties filed cross-motions for summary judgment. ECF Nos. 485, 512. On August 16, 2024, the Court denied Vir2us's motion and granted in part and denied in part defendants' motion. ECF No. 574. The Court found that "[b]ecause it is undisputed that Sophos

4

did not integrate any container source code into its products and thus, cannot employ containerization technology, they cannot be a 'natural . . . derivation' of an 'accused container product.'" *Id.* at 13. It further found, however, that "there is a genuine dispute of material fact as to whether the container source code was enabled in the Invincea products." *Id.* at 15.

## II.   DISCUSSION

### A.   Rule 702 and Expert Witnesses

Federal Rule of Evidence 702 provides for the admission of expert testimony "in the form of an opinion or otherwise" upon satisfaction of these conditions:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Courts have condensed these requirements into two primary inquiries: "1) whether the proposed expert's testimony is relevant; and 2) whether it is reliable." *Yates v. Ford Motor Co.*, 113 F. Supp. 3d 841, 845 (E.D.N.C. 2015) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *United States v. Forrest*, 429 F.3d 73, 80 (4th Cir. 2005)).

To be considered reliable, expert testimony must be grounded in "scientific, technical, or other specialized knowledge and not on belief or speculation" and "derived [from the use of] scientific or other valid methods." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (citation omitted). *Daubert* identified several, non-exhaustive guideposts that may apply when assessing reliability–testing; peer review/publication; error rate; and general acceptance of

the method used. *Daubert*, 509 U.S. at 593–94. Whether these guideposts or other factors apply to assess reliability often depends on the nature of the case, the expertise applied, and opinions at issue. *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021). The analysis to be employed is flexible and designed "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152 (noting "considerable leeway" given to trial courts in assessing reliability of proposed expert testimony).

A court must also consider the relevance of an expert's testimony by asking "whether expert testimony proffered . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute[.]" *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3rd Cir. 1985)). Under this test, scientific studies must have "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591–92.

The proponent of expert testimony bears the burden of establishing, by a preponderance of the evidence, that the testimony is admissible in accordance with these principles. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

**B.     Vir2us's Motion to Exclude Sara Rinke—Invincea's Damages Expert**

Vir2us advances one argument in favor of excluding Rinke, Invincea's damages expert. In *one* sentence of her initial report she said that she was opining on the damages Invincea incurred as a result of Vir2us's refusal to enter into a license agreement with *Netainer*. ECF No. 591-4, at 20. This single sentence, according to Vir2us, warrants exclusion of Rinke's opinions because the actions underlying the assumption—Netainer being the transacting party rather than Sandboxie— do not amount to a breach of the Agreement "as a matter of law." ECF No. 589, at 3. Although

6

the Court recognizes its previous summary judgment ruling on the significance of whether Vir2us was to contract with Netainer or Sandboxie,[4] the Court rejects Vir2us's invitation to exclude Rinke's testimony as it is missing the forest for a single tree.  On countless occasions, in both her reports and deposition testimony, Rinke was clear that she was opining on Invincea's damages based on Vir2us's failure to enter a new license agreement with *Sandboxie*.

First, Rinke's initial report quoted directly from Invincea's counterclaim, which references an agreement between Vir2us and Sandboxie:

> Vir2us breached its duty by knowingly and expressly refusing to acknowledge or act in accordance with its obligation to execute a new license agreement with *Sandboxie* "in the form" of the Patent License Agreement and otherwise refusing to cooperate with Sophos and Invincea concerning the proposed transaction with Netainer.  Vir2us also took active, improper steps by refusing to allow Invincea to share the terms of the Patent License Agreement with Netainer and by making improper demands for and/or misuse of confidential information.

ECF No. 591-4, at 5 (emphasis added) (quoting ECF No. 78, at 27); *see also id.* at 17 (stating the same).

Second, in her reply report, Rinke again reiterated that her damages assessment was based on Vir2us's failure to enter a new license agreement with Sandboxie:

> As discussed in my Opening Report, Invincea alleges that "Vir2us breached its duty by knowingly and expressly refusing to acknowledge or act in accordance with its obligation to execute a new license agreement with *Sandboxie* 'in the form' of the Patent License Agreement and otherwise refusing to cooperate with Sophos and

---

[4] In relevant part, the Court denied summary judgment on Invincea's counterclaim because:

> a factual dispute exists regarding whether the proposed license agreement would be between Vir2us and Sandboxie or between Vir2us and Netainer.  If the agreement was between Sandboxie and Vir2us, then § 2.1.2.2 obligates Vir2us to enter the agreement.  ECF No. 499-1 ¶ 2.1.2.2 (stating that if the conditions are met "Vir2us must execute the agreement").  But if it is ultimately shown that the agreement was between Vir2us and Netainer, then Vir2us was under no obligation to execute a license agreement.

ECF No. 574, at 20.

Invincea concerning the proposed transaction with Netainer" and that "[a]s a result of Vir2us's breach, Netainer terminated the proposed transaction, thereby damaging Invincea." Consistent with the role of a damages expert, I have assumed liability of the claim asserted by Invincea against Vir2us.

ECF No. 618-4, at 8–9 (emphasis added) (quoting ECF No. 78, at 26–27).

Third, at Rinke's deposition, she again made clear that her underlying assumption that the new license agreement would be between Vir2us and Sandboxie:

> [QUESTION]: What is the specific breach alleged by the defendants?
> . . .
> [RINKE]: I think my understanding of it -- and as I've laid -- as I've identified and I've stated on page 2 of my report is my understanding of the counterclaim, is that "Vir2us breached its duty by knowingly and expressly refusing to acknowledge or act in accordance with its obligation to execute *a new license agreement with Sandboxie* 'in the form' of the patent license agreement." I can read -- my understanding is that -- what I've laid out in my report. I can continue reading it.

ECF No. 637-1, at 44:15–45:3 (emphasis added).

With that said, the Court concludes that Rinke's expert testimony is relevant to Invincea's counterclaim.[5]

## C.   Defendants' Motion to Exclude Certain Expert Opinions and Testimony

Defendants move to exclude certain expert opinions and testimony of David Martens ("Martens") and Dansky, asking the Court to preclude:  (a) Martens and Dansky "from offering factual testimony disguised as expert opinions"; (b) Martens from "testifying about Invincea's machine-learning algorithms and technology or machine[-]learning technology generally because he is not qualified to do so"; and (c) Martens and Dansky "from providing testimony regarding the Sophos products that were subject to the Court's summary judgment order."  ECF No. 600, at 4.

---

[5] Vir2us does not argue that Rinke's proffered expert opinions are not reliable.

1.      **Expert testimony related to Sophos products is excluded.**

In light of the Court's August 16, 2024 partial summary judgment ruling—that Sophos products do not employ containerization technology and are non-royalty bearing, ECF No. 574, at 15—and Vir2us's representation in its opposition to defendants' motion that it "will not present any evidence related to Sophos's products . . . at the upcoming trial because . . . the[y] are outside the scope of the remaining issues to be tried[,]" ECF No. 611, at 9–10, the Court excludes any expert testimony relating to Sophos products.

2.      **David Martens—Vir2us's Software and Source Code Expert**

Defendants advance two arguments in support of limiting Martens' expert testimony.  First, they contend that he should not be permitted to offer opinions on machine-learning technology because he is not qualified to do so.  ECF No. 600, at 13.  The Court can easily dispose of this challenge because Vir2us now represents that it "will not present any evidence related to . . . machine-learning technology at the upcoming trial because . . . [it] is outside the scope of the remaining issues to be tried."  ECF No. 611, at 9–10.  Thus, Martens may not testify about the same.[6]

Second, defendants contend that Martens' opinions essentially regurgitate factual information, complaining of Martens' discussion of documents and witness testimony about Invincea's marketing practices and product lines.  ECF No. 600, at 12.  They also argue that Martens' reports "are replete with [his] interpretation of documents and testimony that do not bear on his source code analysis."  *Id.* at 6; *see also id.* at 12 ("[I]t would be improper to permit . . . Martens to testify about lay witness testimony and marketing materials that have nothing at all to

---

[6] The Court notes, however, that, to the extent that the documents Martens reviewed discuss machine-learning technology, Martens may testify to the contents of those documents for background, subject to contemporaneous objections made at trial.

do with how the underlying source code operates."). Relatedly, defendants argue that, because Martens' expertise is limited to source code, testimony beyond that expertise should be excluded. *Id.* at 9.

Vir2us counters that Martens relied on the facts at issue, in addition to his source code analysis, "to form and support his opinions related to certain Invincea products." ECF No. 611, at 11. In opining that all versions of X by Invincea consist of identical source code, Vir2us contends that Martens relied on Invincea's marketing materials, the merger agreement between Invincea and Sophos, and witness testimony—the discussion of which defendants now challenge—"to connect the source code he reviewed to products sold by [d]efendants," which was "not apparent from the source code itself." *Id.* (citing ECF No. 600-1, at 14–21). That is, Martens' "expertise is not limited exclusively to source code[,]" but extends to "review[ing] other documents describing how software operates in conjunction with reviewing the corresponding source code itself." *Id.* at 13 (citing ECF No. 600-1, at 5–6).

The challenged portions of Martens' report primarily encompass his discussion of Invincea's product line. Martens cites the merger agreement between Invincea and Sophos to explain how product names and build numbers were listed under the Invincea X product. ECF No. 600-3, at 12–13. Then, for example, citing various marketing materials and the deposition of Akhilesh Patel (Invincea's 30(b)(6) designee for marketing materials) Martens states:

- "X by Invincea *was marketed by Invincea* as the successor endpoint product to Invincea Advanced Endpoint Protection." ECF No. 600-3, at 15 (emphasis added).

- "For example, in a document titled 'Why Move to X by Invincea,' Invincea describes X by Invincea as having 'all the features of Invincea Advanced Endpoint Protection, but also includes the option to add new premium capabilities.'" *Id.*

- "Invincea describes three different versions or deployment options for X by Invincea:  X by Invincea Detect, X by Invincea Prevent, X by Invincea Complete."  ECF No. 600-3, at 17.

Later in his report, Martens states that "Invincea uses a single build for X by Invincea" that "contains all the source code that is compiled and included in the X by Invincea product."  ECF No. 600-3, at 21.  Citing the portion of his report discussing Invincea's product line, Martens notes that "[t]he result of using a single build is that all versions of X by Invincea are formed from a single set of source code."  *Id.*  Martens opines that his "review of Invincea's source code is consistent with Invincea using a single build for its source code."  *Id.*

An expert may not merely summarize otherwise admissible factual evidence "without some connection to the expert's proffered expertise."  *SAS Ins., Inc. v. World Programming Ltd.*, 125 F. Supp. 3d 579, 587 (E.D.N.C. 2015) (first citing *United States v. Johnson*, 54 F.3d 1150, 1157 (4th Cir. 1995); and then citing *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 608 (S.D.W. Va. 2013)).  "The Fourth Circuit has instructed that '[t]estimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror.'  Furthermore, if 'the proposed testimony will recount or employ scientific, technical, or other specialized knowledge, it is a proper subject' for expert testimony."  *Phoenix Renovation Corp. v. Rodriguez*, 439 F. Supp. 2d 510, 523 (E.D. Va. 2006) (quoting *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993)).

No doubt the jury will need to evaluate evidence about various source code—the implementation of which, and functionality of, is outside the knowledge and expertise of a typical lay juror—to determine which Invincea products are royalty bearing.  *See Allscripts Healthcare, LLC v. Andor Health, LLC*, No. 21-704-MAK, 2022 WL 17403113, at *2 (D. Del. Aug. 9, 2022)

("[T]estimony about how . . . source code works or how it is written requires specialized knowledge and technical experience as a code developer."). Grounds exist to credit Vir2us's argument that Martens' opinions and discussion of the facts on which he based his opinions "will unquestionably help the jury understand that all variants of X by Invincea are identical products with identical functionality despite Invincea marketing them under different names." ECF No. 611, at 5. And, contrary to defendants' argument, Martens connects the challenged discussion to his source code analysis to bolster his ultimate opinions. *See* 600-3, at 21. Therefore, to the extent that Martens intends to testify to the challenged portions of his report to provide background and contextualize the evidence before the jury, and to support his analysis of the source code, he may do so.[7]

The Court notes, however, that there are several challenged statements in Martens' report in which he—citing to various depositions and exhibits thereto—opines on defendants' or their representatives' state of mind. *See* ECF No. 600-3, at 14 ("When assessing Invincea's products prior to completing the acquisition, *Sophos considered Invincea X to be* a rebranded version of Invincea Advanced Endpoint Protection with both products including machine learning functionality." (emphasis added) (citing Watkiss Dep. at 22:20–23:1)); *id.* at 15 ("Deep learning *is considered by Invincea* to be an advanced type of machine learning." (emphasis added) (citing Patel Dep. 15:2–16:15, 22:12–20, 75:17–18)); *id.* at 17 ("*Mr. Patel would interpret* the X by Invincea Complete product to offer spear phishing protection as that term was used by marketing personnel at Invincea." (emphasis added) (citing Patel Dep. 68:12–69:17, 73:20–74:3)). Although Martens may describe the features of the Invincea product line and statements by defendants about

---

[7] Any rulings on the extent of such testimony, that is, how much background is appropriate for Martens to provide, however, must await the assertion of timely and proper objections at trial.

the same to the extent they are supported by the documents and deposition testimony he relies on,[8]

he may not speculate about Sophos or Invincea's and their witnesses' state of mind. *See City of Huntington v. AmerisourceBergen Drug Corp.*, No. 3:17-01665, 2021 WL 1320716, at *2 (S.D.W. Va. Apr. 8, 2021) ("[E]xpert testimony regarding a corporation's motive, intent, or state of mind is likewise inadmissible." (citations omitted)).   Likewise, Martens may not testify to the consistency or credibility of evidence in the record. *See, e.g.*, ECF No. 600-3, at 17 ("Mr. Patel's *testimony is consistent with* Invincea marketing materials[.]" (emphasis added)).

### 3.    Michael Dansky—Vir2us's Damages Expert

Defendants argue that the Court should preclude Dansky from testifying about negotiations between Invincea, Sophos, and Netainer regarding the potential spinoff of Sandboxie as stated in his November 1, 2019 rebuttal report.  ECF No. 600, at 8–9, 11–12 (citing ECF No. 600-6, at 8–12).  Vir2us contends that Dansky's discussion of these facts is proper as they form the basis of his rebuttal expert opinion—that Rinke's damages calculations "are speculative and unsupported by the facts of this litigation" because she "failed to consider facts that must be accounted for to properly attribute damages to Vir2us's alleged breach of the . . . Agreement."  ECF No. 611, at 14–15.

Dansky attacks Rinke's statement that "[b]ut-for [Vir2us's] alleged breach" of the Agreement, the Netainer Deal would have closed, ECF No. 618-3, at 20, because it moves beyond an assumption of liability to an impermissible (and incorrect) assumption of causation, ECF No. 600-9, at 8.  He then interprets the "Sophos-Netainer Term Sheet" and states that its non-binding nature "suggests" that Rinke's "assumption that 'the transaction would have closed' is speculative." *Id.* at 9.  He then extensively reviews the events surrounding the termination of the

---

[8] The Court was not provided with copies of these materials in the filings with these motions.

Invincea-Netainer deal, which Dansky contends show "that numerous issues, apart from Vir2us's actions, impeded progress in the negotiations of the proposed Netainer Deal, caused the deal to evolve, contributed to significant delays, and ultimately caused the failure of the Netainer Deal." *Id.* at 9–13. This recitation—encompassing nearly four pages of Dansky's report—includes a 22-point list of communications between the parties to the Netainer Deal. Dansky then states that "[t]hese emails and testimony make clear that both Sophos and Netainer, with their evolving negotiating positions and business needs, contributed to the failure of the Netainer Deal in substantive ways." *Id.* at 13. As a result, according to Dansky, "Rinke's failure to account for any other factors contributing to the ultimate failure of the Netainer Deal fundamentally undermines her damages opinion." *Id.* at 14. The Court agrees with defendants that this proffered expert testimony is not admissible.

First, Dansky's rebuttal opinions, and his factual discussion that underpins them, are not relevant because they will not "help[] 'the trier of fact to understand the evidence or to determine a fact in issue.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (quoting *Daubert*, 509 U.S. at 591). "The touchstone of whether a witness may testify as an expert under Fed. R. Evid. 702 is . . . whether he would be 'helpful,' but it is helpfulness to the *trier of fact*, not to a party's case, that counts." *Hardin v. Ski Venture, Inc.*, 50 F.3d 1291, 1296 (4th Cir. 1995). Expert testimony which "merely regurgitates factual information that is better presented directly to the jury rather than through the testimony of an expert witness" is properly excluded. *Hines v. Wyeth*, No. 2:04-0690, 2011 WL 2680842, at *5 (S.D.W. Va. July 8, 2011).

As a damages expert, Rinke "may assume liability in order to address damages; [her] testimony is, of course, not *proof* of liability." *Mahaska Bottling Co. v. PepsiCo, Inc.*, 441 F. Supp. 3d 745, 757 (S.D. Iowa 2019); *see also Sancom, Inc. v. Qwest Commc'ns Corp.*, 683 F.

14

Supp. 2d 1043, 1068 (D.S.D. 2010) ("[I]t is well-settled that a damages expert . . . can testify as to damages while assuming the underlying liability." (citing *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 660 (N.D. Ill. 2006)). Stated simply, Rinke assumes liability and calculates damages as if the Netainer Deal had closed.

An expert report "must directly address an opposing expert's findings or opinions to qualify as rebuttal." *Boles v. United States*, No. 1:13cv489, 2015 WL 1508857, at *4 (M.D.N.C. Apr. 1, 2015). Vir2us's contention that Dansky is permitted to "undermine[] Rinke's opinions by illustrating that . . . Rinke skipped the essential step of connecting damages to the alleged breach[,]" *id.* at 15 (citation omitted), misses the mark. Although Vir2us is correct that Invincea must prove causation—that Vir2us's breach of the Agreement caused Invincea's damages—to prevail on its breach of contract counterclaim, it neither does, nor is it permitted to do so, through Rinke's testimony. Multiple times, in both her report and at her deposition, Rinke makes clear that she offers no opinions on liability or causation. *See, e.g.*, ECF No. 618-3, at 5, 21; ECF No. 618-4, at 9; ECF No. 618-5, at 6:24–7:8, 10:9–14, 11:14–18. And, she may offer her damages opinion without doing so. *See, e.g.*, *Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*, No. 2:15cv512, 2017 WL 1319553, at *4 (E.D. Tex. Apr. 10, 2017) ("[I]t is perfectly permissible for an expert to assume liability (of which causation is an element) and simply focus on the issue of damages.").

Even more, defendants represent to the Court that Rinke will not provide any testimony on causation or liability. ECF No. 600, at 9 ("[Vir2us] claims that this discussion is necessary to rebut Defendants' damages expert Sarah Rinke's conclusions on causation, but Ms. Rinke does not offer any opinions on causation."); ECF No. 627, at 4 ("Like any damages expert, [Rinke] assumes that liability has been proven—that Vir2us's actions breached the contract and caused harm to Invincea—but does not herself offer opinions concerning liability. Instead, her opinion is limited

to estimating the lost value of the Netainer deal to Invincea *and her testimony would be limited in the same way.*" (emphasis added)).

Thus, Dansky's detailed recitation of his understanding of the facts surrounding the Netainer Deal and his opinion on the likelihood of it closing do not rebut Rinke's *damages* opinion. Instead, Dansky's proffered opinions and testimony relating to the Netainer Deal "usurp[s] the exclusive function of the jury to weigh the evidence and determine credibility." *United States v. Samara*, 643 F.2d 701, 705 (10th Cir. 1981).

In rebuttal, however, Dansky may try to undermine the methodology Rinke used to calculate *damages*, *United States v. Stitt*, 250 F.3d 878, 897 (4th Cir. 2001), such as his opinion that Rinke's "failure to deduct post-closing costs which Invincea would have incurred is a methodological error[,]" ECF No. 600-9, at 14. But Dansky may not seize on Rinke's lack of a causation opinion as a vehicle to summarize facts relating to, and opine on, causation. The jury will be more than capable of weighing the evidence and deciding whether the Netainer Deal would have closed but for Vir2us's actions. *Robroy Indus.-Texas, LLC*, 2017 WL 1319553, at *9 ("[D]enominating a witness as an expert does not give that witness leave to simply read materials such as exhibits and depositions in the case and then testify as to their contents. Such evidence is not helpful to the jury where the jury can easily reach reliable conclusions based on common sense, common experience, and the jury's own perceptions . . . ." (internal quotation and citation omitted)).

Second, not only are Dansky's opinions not relevant, but they are also not reliable because they are not "based on scientific, technical, or other specialized *knowledge*." *Oglesby*, 190 F.3d at 250 (citing *Daubert*, 509 U.S. at 589). To be admissible, the Court "must ensure that the proffered expert opinion is 'based on scientific, technical, or other specialized *knowledge* and not on belief

16

or speculation, and inferences must be derived using scientific or other valid methods.'" *Nease*, 848 F.3d at 229 (quoting *Oglesby*, 190 F.3d at 250); *see also Daubert*, 509 U.S. at 589–90. Dansky merely states, among other things, that "[t]he documentary evidence and deposition testimony from witnesses involved in the Netainer deal is in clear conflict with [Rinke]'s apparent assumption that Vir2us's actions were the sole, 100% cause of the Netainer Deal's failure." ECF No. 600-9, at 14. This statement is not based on his "extensive business experience with intellectual property licensing transactions[,]" as Vir2us now argues. ECF No. 611, at 16. Dansky does not use any specialized knowledge or economic methodology to determine which evidence relating to the Netainer Deal to emphasize, witnesses to believe, or conclusions to draw; he simply opines on his belief as to what happened.

Because Dansky "is not in a better position than the fact finder to render an opinion" on the probability that the Netainer Deal would have closed, such testimony is excluded. *Noland v. French*, 134 F.3d 208, 217 (4th Cir. 1998). To the extent that Dansky intends to testify about other perceived flaws in the methodology Rinke used to calculate damages, he may do so. For the reasons set forth above, however, any testimony by Dansky relating to either the *facts* surrounding the deal between Sophos and Netainer or his opinions on factors contributing to, or the ultimate cause of, the demise of that deal, are excluded.[9]

---

[9] Whether such matters and the gist of Dansky's critique of Rinke's assumptions of liability may be raised during cross-examination of Rinke, are reserved for trial. Additionally, although Rinke's reports recite some alleged facts surrounding the negotiations between Netainer and Sophos, she will not be allowed to testify to the same at trial. *See* ECF No. 618, at 7; *see also* ECF No. 618, at 10 ("Rinke's testimony . . . will be limited to the appropriate amount of damages, including the value of the Netainer transaction and discount/interest rate[.]").

**D.     Defendants' Motion to Strike Dansky's Second Supplemental Expert Report**

Lastly, defendants move the Court to strike portions of Dansky's second supplement in which he opines, in part, that defendants breached ¶ 3.3 of the Agreement by making insufficient annual minimum royalty payments, and to preclude Vir2us from relying on this theory both in its pending summary judgment motion and at trial. ECF No. 625, at 4. In addition to the provisions discussed above (¶¶ 3.1, 4.1), ¶ 3.3 of the Agreement provided for Invincea to pay Vir2us a "Guaranteed Minimum Royalty" ▊▊▊▊ over the term of the Agreement. ECF No. 597-1, at 5. To implement this, the Agreement required Invincea to pay Vir2us an "Annual Minimum Royalty" of no less than ▊▊▊▊ per year and

> [i]f in any given License Year the Guaranteed Minimum Royalty has not been already paid to Vir2us and the dollar amount of Royalty paid by Invincea to Vir2us is less than the Annual Minimum Royalty, then Invincea shall pay to Vir2us an amount calculated by deducting the Royalties paid to Vir2us in the given License Year from the Annual Minimum Royalty[.]

*Id.* at 6.

On November 27, 2024, Dansky disclosed his second supplement to account for "events that occurred since [he] prepared [his] last expert export"—the Court's summary judgment ruling that all Sophos products were not royalty bearing under the Agreement and the sale of additional allegedly royalty bearing products in the intervening time. ECF No. 625-2, at 4. Dansky updated his analysis to: (a) exclude sales of Sophos products ("step one"); and (b) "account for annual minimum royalty payments that defendants made after [he] prepared [his] prior expert reports" ("step two"). *Id.* After step one, Dansky opined that although defendants had paid the ▊▊▊▊ Guaranteed Minimum Royalty between 2016 and 2022, defendants' sales of royalty bearing products fell below the ▊▊▊▊ threshold in 2018 and 2019. *Id.* He then calculated the interest due to Vir2us because of these deficient payments—step two. *Id.*

18

Defendants seek to strike step two under Rule 37(c)(1) of the Federal Rules of Civil Procedure because it impermissibly advances a new theory of liability under ¶ 3.3.2 of the Agreement, it is not timely, it is not a proper supplement under Rule 26(e) of the Federal Rules of Civil Procedure, and its untimely disclosure is not substantially justified or harmless. ECF No. 625, at 12. Vir2us responds that Dansky's second supplement does not advance a "new theory" of liability but simply accounts for the Court's partial summary judgment ruling. ECF No. 661, at 4. Because Vir2us did not allege in its complaint that defendants breached the Agreement by breaching the Guaranteed Minimum Royalty provision, and because the second supplement is not a proper supplement under the Federal Rules, the Court strikes part two of Dansky's second supplement.

"[A] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief[,]" Fed. R. Civ. P. 8(a)(2), "in order to give the defendant *fair notice* of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted) (emphasis added). Vir2us's complaint, filed over five years ago, discusses only ¶¶ 3.1 and 4.1 of the Agreement. ECF No. 6. Not once is there any reference to the Annual Minimum Royalty provision, ¶ 3.3 of the Agreement, never mind any allegation that defendants breached that provision triggering the obligation to pay interest under ¶ 4.3.3.

Rather, the bases for Vir2us's claims to relief are clear—defendants breached the Agreement by failing to: (a) deliver the quarterly reports required by ¶ 4.1 beginning in the first quarter of 2017, ECF No. 6, at 10–11 ("Count I Breach of Contract (Failure to Deliver Quarterly Reports)"); and (b) "pay the required Royalty under Paragraph 3.1 of the . . . Agreement[,]" *id.* at 11–12 ("Count II Breach of Contract (Failure to Pay Royalties)"). Thus, with respect to royalties,

19

at trial the jury must determine whether defendants breached ¶ 3.1 of the Agreement—that is, that they failed to pay "Vir2us a royalty of ███████ ████████ for each Container Products and Services Sold in the United States . . . during the Term of [the] Agreement[.]" ECF No. 597-1, at 5. Defendants alleged breach of ¶ 3.1 of the Agreement is the only royalty-related theory on which Vir2us claimed it is entitled to relief. Because defendants did not have "fair notice" that Vir2us was advancing the new theory of breach of contract, Dansky's second supplement may not advance that theory now.

The Court rejects Vir2us's arguments to the contrary. Although Vir2us now argues that it "has always sought all *unpaid* royalties due under the . . . Agreement." ECF No. 661, at 12 (emphasis added), Dansky does not opine that defendants *failed to pay* the Guaranteed Minimum Royalty. Instead, he opines that they did not pay it timely, and the Agreement mandated payment of outstanding interest. And Vir2us's argument that, before the Court's partial summary judgment ruling, it was seeking royalties in an amount greater than the minimum annual royalty each license year, and thus did not advance this theory, does not help its cause. The Federal Rules are clear that "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). Vir2us *could* have pleaded a claim in the alternative for breach of ¶ 3.3.2 at the time it filed its complaint; it chose not to. Vir2us *could* have moved to amend its complaint to plead an alternative claim of breach of contract after defendants allegedly made an insufficient minimum annual royalty payment on September 12, 2019; it chose not to. Although it may have been strategic at that time not to do so, Vir2us may not mitigate the consequences of that decision by reversing course and injecting new issues into the case on the eve of trial.

For nearly five years Vir2us knew the facts needed to assert and prove that defendants breached ¶ 3.3.2, and the Court's partial summary judgment ruling did not change that. Vir2us

knew the amount of the royalties defendants paid each year.  Even giving Vir2us the benefit of the

doubt as to its knowledge of the annual royalties it was due, it knew *no later than 2020* that

defendants' annual minimum royalty payments were deficient.   ECF No. 661, at 11–12

("Defendants have admitted they failed to pay the annual minimum royalty payments required by

the License Agreement since 2020." (citing ECF No. 411-2, at 2–4)).  Vir2us's decision neither to

plead breach ¶ 3.3.2, nor to move to amend its complaint after defendants' *admission* of the same,

was strategic.  It cannot shed that decision simply because the posture of the case has changed,

making the alternative route more advantageous to pursue now.[10]

For these same reasons, part two of Dansky's second supplement is not a proper

supplementation of his prior reports.  "[I]f the party learns that [it] is incomplete or incorrect, and

if the additional or corrective information has not otherwise been made known to the other parties

during the discovery process or in writing[,]" it "must supplement" the disclosure.  Fed. R. Civ. P.

26(e)(1)(A).   Vir2us contends that its disclosure of the second supplement was to satisfy its

obligation under Rule 26(e).  But Rule 26 does not "bestow upon litigants unfettered freedom to

---

[10] Vir2us's discovery responses confirm that it was not pursuing the theory of breach Dansky now
raises in his second supplement.  Defendants served Interrogatory No. 6 on Vir2us on April 22,
2019, which requested that Vir2us

> Describe in detail each and every type or element of financial damages or harm that
> Vir2us has allegedly incurred as a result of the alleged breach of the License
> Agreement by Defendants, including the total dollar amount of the damages
> claimed; the economic theory on which your damages claim is based; each and
> every fact upon which You will rely for proof of the existence and the amount of
> damages; the identification of the documents on which You will rely to prove such
> damages; and the identity of each person with knowledge of the amount of damages
> allegedly suffered by You.

ECF No. 625-6, at 10.  In response, Vir2us directed defendants to the Complaint, which, as set
forth above, *does not mention ¶ 3.3.2* of the Agreement.  ECF No. 625-9, at 10; *see also* ECF No.
625-10, at 10–11; ECF No. 625-11.

rely on supplements produced after a court-imposed deadline[.]" *Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655, 662 (N.D. Ga. 2001). Instead, it "imposes a *duty* on [a party]; it grants them no *right* to produce information in a belated fashion." *Id.*; *see also, e.g.*, *Goodrich v. John Crane, Inc.*, No. 4:17cv9, 2018 WL 10562401, at *8 (E.D. Va. Aug. 10, 2018) ("Rule 26(e) does not provide for supplemental reports that bolster the report originally provided."); *Coles v. Perry*, 217 F.R.D. 1, 3 (D.D.C. 2003) ("[Rule] 26(e) does not grant a license to supplement a previously filed expert report because a party wants to[.]"); *Gallagher v. S. Source Packaging, LLC*, 568 F. Supp. 2d 624, 630 (E.D.N.C. 2008) ("Supplementation [of an expert report], however, is not a license to amend an expert report to avoid summary judgment."). And, supplementation "does not cover failure of omission because the expert did an inadequate or incomplete preparation." *Sharpe v. United States*, 230 F.R.D. 452, 462 (E.D. Va. 2005) (quoting *Akeva LLC v. Mizuno Corp.*, 212 F.R.D. 306, 310 (M.D.N.C 2002)).

To account for "events that occurred since [he] prepared [his] last expert export"— the Court's ruling that all Sophos products were not royalty bearing under the Agreement and additional sales of allegedly royalty bearing products—Dansky's second supplement contains two main changes. ECF No. 625-2, at 4. First, Dansky "updated [his] analysis to exclude sales of Sophos products." *Id.* Defendants do not challenge this. Second, Dansky justifies the disclosure of his supplemental report by stating that he merely updates his analysis "to account for annual minimum royalty payments that Defendants made after [he] prepared [his] prior expert reports." *Id.* After Dansky removed Sophos products from his damages calculation, sales of royalty-bearing products in multiple years were fewer than ▮▮▮▮ ▮▮▮▮, and thus annual minimum royalty payments were due. But this revision is based on information known to Dansky at the time he submitted his prior reports. As defendants correctly argue:

22

Although Defendants continued to make annual minimum royalty payments after the date of Mr. Dansky's November 14, 2019 supplemental report, Vir2us is only claiming that there were shortfalls in Defendants' annual minimum royalty payments on September 13, 2018 and September 12, 2019. The first allegedly deficient payment was made before Mr. Dansky filed his initial expert report on September 16, 2019, and both allegedly deficient payments were made before Mr. Dansky filed his first supplemental report on November 14, 2019. If these two specific payments were deficient and caused damage to Vir2us, Vir2us and Mr. Dansky could and should have addressed them and provided a damages estimate years ago.

ECF No. 625, at 11. For these reasons, part two of Dansky's second supplement is *not a supplement* as envisioned by the Federal Rules.

Vir2us did not plead that defendants breached the Agreement by not paying the Annual Minimum Royalty in ¶ 3.3.2 of the Agreement. ECF No. 6; *see also* ECF No. 597-1, at 6. Thus, part two of Dansky's second supplement is not relevant to any triable issue and is stricken.

### III.   <u>CONCLUSION</u>

For these reasons, it is **ORDERED** that:

1. Vir2us's motion to exclude Rinke, ECF No. 581, is **DENIED**.

2. Defendants' motion to exclude certain opinions and testimony of Vir2us's expert witnesses, ECF No. 590, is **GRANTED IN PART** and **DENIED IN PART**. In sum, any expert testimony relating to Sophos products from either Martens or Dansky is excluded. Martens may not testify about machine-learning technology. Furthermore, although Martens may testify about the contents of materials and testimony he relied on in forming his opinions, including Invincea's marketing materials, to provide background and support for his opinions, he may not testify to any party or witnesses' state of mind or to the credibility of evidence in the record. Lastly, Dansky's proffered testimony relating to the Netainer Deal is excluded.

3.     Defendants' motion to strike in part Dansky's second supplemental expert report, ECF No.

620, is **GRANTED**.

The Clerk shall deliver a copy of this opinion and order to all counsel of record.

_____

Robert J. Krask
United States Magistrate Judge

Norfolk, Virginia
January 14, 2025